# In the United States Court of Federal Claims

No. 11-389L

(Filed: August 20, 2013)

_____

|  |  |  |
|---|---|---|
| DENNIS J. QUEBEDEAUX, on behalf of himself and all other similarly situated persons and entities, | * * * * | |
| | * | Takings case; Motion to dismiss under |
| | * | RCFC 12(b)(6); Morganza Floodway – |
| Plaintiffs, | * | release of water; *Iqbal/Twombly* – pleading |
| | * | standard; *Sponenbarger* doctrine; Tort vs. |
| v. | * | takings; Rejection of bright line test in favor |
| | * | of multi-factored approach; Motion denied. |
| THE UNITED STATES, | * | |
| | * | |
| Defendant. | * | |

_____

**OPINION**

_____

*Richard Lyle Coffman*, The Coffman Law Firm, Beaumont, TX, for plaintiffs.

*Joshua Pratt Wilson*, Environment and Natural Resources Division, United States Department of Justice, Washington, D.C., with whom was Assistant Attorney General *Ignacia S. Moreno*, for defendant.

**ALLEGRA, Judge:**

This takings case is before the court on defendant's motion to dismiss the complaint pursuant to RCFC 12(b)(6). Plaintiffs own land in the Morganza Floodway and Atchafalaya River basin, part of the Lower Mississippi River Valley. They seek just compensation under the Fifth Amendment for an alleged takings associated with the inundation of their property with water diverted from the Mississippi River.[1] Based on its careful review of the briefs, and oral argument, the court hereby **DENIES** defendant's motion.

---

[1] Plaintiffs seek certification of a class of similar-situated property holders. The court has deferred consideration of class certification under RCFC 23 until resolution of this motion.

**I.     BACKGROUND**[2]

The facts required here are relatively simple and few.

The Morganza Floodway, which includes the Morganza Spillway, is part of the Mississippi River & Tributaries Project (the MR&T Project) – the comprehensive federal system of levees, flood control channels, dams, pumping stations, and reservoirs designed to control floods on the Mississippi River.[3] The Morganza Spillway is a structure on the Mississippi River that sits at the head of the Morganza Floodway. This 3,900-foot structure features 125 floodgates and other structures. Ordinarily, the Spillway gates remain closed. However, during flood events, the Morganza Spillway can be opened to divert water through the Morganza Floodway into the Atchafalaya River basin.

Upriver on the Mississippi from the Morganza Spillway lies another flood control structure, the Old River Control Structure. This is used routinely to divert water from the Mississippi River into the Atchafalaya River basin. The Morganza Spillway is opened only during extreme flood events to divert additional water into the Atchafalaya River basin.

The Morganza Spillway has been opened only twice – once during a 1973 flood, and again on or about May 14, 2011, during the flood event that underlies plaintiffs' lawsuit. In the latter instance, the Army Corps of Engineers (the Corps) became concerned that flooding along the Mississippi River would overwhelm the levees in Baton Rouge and New Orleans. After considering several alternatives, the Corps decided to open the Morganza Spillway to 21 percent of its maximum capacity to prevent flooding downriver. As a consequence, the Morganza Floodway, the Atchafalaya River basin, and its residents and property owners were inundated with flood waters between May 14, and July 7, 2011. According to plaintiffs, this flooding destroyed, damaged and/or devalued their crops, farms, homes, businesses, buildings, structures, equipment, oil and gas wells, fishery waters, and other real and personal property.

On June 15, 2011, plaintiffs filed a complaint in this court seeking just compensation for the destruction to their property caused by the flooding. They allege that defendant's intentional diversion of flood water "constitutes an ongoing, continuous and permanent physical taking" of their property without just compensation. They aver that the existence of the MR&T Project evidences defendant's permanent commitment to the intermittent, but inevitably recurring, flooding of plaintiffs' property and businesses. On September 21, 2011, plaintiffs filed their amended complaint. On October 19, 2011, defendant filed a 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted. Briefing and argument of that motion have been completed.

---

[2] These facts are drawn largely from plaintiffs' complaint, and, for purposes of this motion, are assumed to be correct. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

[3] Congress authorized the creation of the MR&T Project following the great 1927 Mississippi River Flood. *See Cent. Green Co. v. United States*, 531 U.S. 425, 432 (2001).

## II. DISCUSSION

Deciding a motion to dismiss "starts with the complaint, which must be well-pleaded in that it must state the necessary elements of the plaintiff's claim, independent of any defense that may be interposed." *Holley v. United States*, 124 F.3d 1462, 1465 (Fed. Cir. 1997); *see also Twombly*, 550 U.S. at 554-55. To survive a motion to dismiss for failure to state a claim under RCFC 12(b)(6), the complaint must have sufficient "facial plausibility" to "allow[] the court to draw the reasonable inference that the defendant is liable." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Klamath Tribe Claims Comm. v. United States*, 97 Fed. Cl. 203, 208 (2011). The plaintiffs' factual allegations must "raise a right to relief above the speculative level" and cross "the line from conceivable to plausible." *Twombly*, 550 U.S. at 555, 570; *see also Dobyns v. United States*, 91 Fed. Cl. 412, 422-28 (2010) (examining this pleading standard). Nevertheless, the Federal Circuit has reiterated that "[i]n ruling on a 12(b)(6) motion to dismiss, the court must accept as true the complaint's undisputed factual allegations and should construe them in a light most favorable to the plaintiff." *Cambridge v. United States*, 558 F.3d 1331, 1335 (Fed. Cir. 2009); *see also Bank of Guam v. United States*, 578 F.3d 1318, 1326 (Fed. Cir. 2009), *cert. denied*, 130 S. Ct. 3468 (2010); *Petro-Hunt, LLC v. United States*, 90 Fed. Cl. 51, 68 (2009).

Plaintiffs seek compensation from the United States pursuant to the Fifth Amendment's instruction: "[N]or shall private property be taken for public use, without just compensation." Because defendant conducted no formal exercise of eminent domain, this case is for an alleged "inverse condemnation." *See Cary v. United States*, 552 F.3d 1373, 1376 (Fed. Cir. 2009), *cert. denied*, 129 S. Ct. 2878 (2009); *Moden v. United States,* 404 F.3d 1335, 1342 (Fed. Cir. 2005). Defendant makes two arguments as to why plaintiffs' complaint should be dismissed. First, it argues that because plaintiffs receive ongoing protection from the MR&T Project, they must allege, as part of their takings claim, that the injuries they suffered from the operation of the Morganza Spillway exceeded the benefits conferred on them by the federal flood control system. Second, defendant asseverates that, as a matter of law, a single flooding event, of the sort alleged by plaintiffs, cannot constitute a takings. The court will consider these arguments, and plaintiffs' responses thereto, *seriatim*.

The Takings Clause is "designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49 (1960); *see also First English Evangelical Lutheran Church of Glendale v. Cnty. of L.A.*, 482 U.S. 304, 318-19 (1987); *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 123-25 (1978). And "[w]hen the government physically takes possession of an interest in property for some public purpose, it has a categorical duty to compensate the former owner." *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 322 (2002) (citing *United States v. Pewee Coal Co.*, 341 U.S. 114, 115 809 (1951)). "These guides," the Supreme Court recently reminded, "are fundamental in our Takings Clause jurisprudence." *Ark. Game & Fish Comm'n v. United States*, 133 S. Ct. 511, 518 (2012). In that same case, the Court emphasized that "most takings claims turn on situation-specific factual inquiries," adding "that no magic formula enables a court to judge, in every case,

whether a given government interference with property is a taking." *Id.* The Court admitted, however, that in rare instances, it has "drawn some bright lines," giving, as examples, situations in which a permanent physical occupation of property occurs or where regulations require a property owner to sacrifice all economic benefit associated with its land. *Id.* (citing *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 426 (1982); *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1019 (1992)).

The Supreme Court long ago recognized that government-induced flooding can constitute a takings. *See United States v. Cress*, 243 U.S. 316, 328 (1917); *Pumpelly v. Green Bay & Miss. Canal Co.*, 80 U.S. 166, 181 (1871) ("where real estate is [] invaded by superinduced additions of water . . . so as to effectually destroy or impair its usefulness, it is a taking, within the meaning of the Constitution"); *see also Loretto*, 458 U.S. at 427-28; *Cotton Land Co. v. United States*, 75 F. Supp. 232, 232-35 (Ct. Cl. 1948). More recently, the Court made clear that floods that are temporary in duration can be compensable and gain no automatic exemption from the Takings Clause. *Ark. Game & Fish*, 133 S. Ct. at 519 ("our precedent indicates that government-induced flooding of limited duration may be compensable"); *see also United States v. Dickinson*, 331 U.S. 745, 751 (1947). These and other cases indicate that "government actions may not," in effect, "impose upon a private landowner a flowage easement without just compensation." *Ridge Line, Inc. v. United States*, 346 F.3d 1346, 1353 (Fed. Cir. 2003). Defendant, however, argues that the courts have established two other bright-line rules that cabin these principles and require dismissal of plaintiffs' complaint.

Defendant first claims that a plaintiff who has benefited from a flood control project may not pursue a takings action unless it avers that the cost of a flooding event exceeds the benefits received from the project as a whole. For the reasons that follow, the court rejects this proposition as a matter of pleading practice, as well as substantive takings law.

In terms of the former, the court flatly disagrees with the notion that a party pleading a takings must address every facet of its claim, including likely defenses, in the complaint. In the court's view, one claiming a takings need not address such matters in order to allege facts that "'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). It is enough that a plaintiff plead enough "factual detail to put defendant on notice as to the basic nature of the claims raised, so as to allow this case to proceed to discovery." *Dobyns*, 91 Fed. Cl. at 430. Takings cases are no exception to this rule. *See TrinCo Inv. Co. v. United States*, 2013 WL 3746090, at *4 (Fed. Cir. July 18, 2013); *Cary*, 552 F.3d at 1376 ("This does not require the plaintiff to set out in detail the facts upon which the claim is based, but enough facts to state a claim to relief that is plausible on its face."); *Petro-Hunt,* 90 Fed. Cl. at 71; *see generally Extreme Coatings, Inc. v. United States*, 109 Fed. Cl. 450, 454 (2013).[4] To meet this standard, a complaint need only aver facts showing that: (i) the plaintiff

---

[4] In rejecting the claim that a party claiming the temporary takings of leases had to plead more specific details regarding the leases, this court, in *Petro-Hunt*, observed –

> At this nascent stage of the proceedings, this court need go no further – contrary to defendant's intimations, plaintiff need not plead every single fact concerning

had a property interest; (ii) defendant caused some form of appropriation of the property to occur; and (iii) just compensation has not been paid. *See Acceptance Ins. Cos., Inc. v. United States*, 583 F.3d 849, 854 (Fed. Cir. 2009), *cert. denied*, 130 S. Ct. 2402 (2010); *Cary*, 552 F.3d at 1376-77, 1380; *Am. Pelagic Fishing Co., L.P. v. United States*, 379 F.3d 1363, 1372 (Fed. Cir. 2004), *cert. denied*, 545 U.S. 1139 (2005); *Ridge Line*, 346 F.3d at 1355; *D.R. Smalley & Sons, Inc. v. United States*, 372 F.2d 505, 508 (Ct. Cl.), *cert. denied*, 389 U.S. 835 (1967). The amended complaint here does all that – and more. Contrary to defendant's claims, plaintiffs did not need specifically to aver that the harm caused by the flood here exceeded the benefits provided to plaintiffs by the flood control project.

Moreover, defendant is simply wrong in suggesting that a takings cannot occur whenever the benefits associated with a flood control program outweigh its costs. Defendant claims that a series of cases supports this proposition. Among these is *John B. Hardwicke Co. v. United States*, 467 F.2d 488, 490 (Ct. Cl. 1972), where the court stated: "[A] condemnor need not compensate a landowner for value which the condemnor creates by the establishment of the project for which the landowner's land is condemned. . . . The same principle is for application when, in a flooding case, the question is whether property is taken at all." *Hardwicke* quotes from *United States v. Sponenbarger*, 308 U.S. 256, 266-67 (1939), where Mr. Justice Black, writing on behalf of the court in a case involving another Mississippi River floodway, stated: "[I]f governmental activities inflict slight damage upon land in one respect and actually confer great benefits when measured in the whole, to compensate the landowner further would be to grant him a special bounty." *See also United States v. Miller*, 317 U.S. 369, 375 (1943); *City of Van Buren, Ark. v. United States*, 697 F.2d 1058, 1061 (1983). Importantly, though, the focus of this cost/benefit analysis is not on whether, broadly speaking, the benefits of a flood control project outweigh its costs. Rather, for purposes of applying the *Sponenbarger* doctrine, "only benefits inuring specifically to the condemnee, rather than to the community at large, are relevant to an analysis of the government's liability under the Fifth Amendment." *Id.* at 1062; *see also Laughlin v. United States*, 22 Cl. Ct. 85, 111-12 (1990), *aff'd*, 975 F.2d 869 (1992). While defendant claims otherwise, nothing in plaintiffs' complaint admits that the particularized

---

      every single lease in order to meet the "plausibility" standard of *Twombly*. The Supreme Court in the latter case (and, even more so in its recent decision in *Iqbal*) made clear that it intended neither to defenestrate the notice pleading rules that have reigned under *Conley v. Gibson*, 355 U.S. 41, 45, 78 S. Ct. 99, 2 L.Ed.2d 80 (1957), nor, correspondingly, to collapse discovery, summary judgment and trial into the pleading stages of a case. *See Twombly*, 550 U.S. at 555, 127 S. Ct. 1955 ("a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations"); *Iqbal*, 129 S. Ct. at 1949-50 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.").

90 Fed. Cl. at 71.

benefits received by the property owners here exceeded the costs associated with the alleged takings.[5]

More importantly for our purposes, as the quote from Justice Black's opinion reveals, the *Sponenbarger* doctrine applies only where the government has inflicted only "slight damage" on the property allegedly taken. 308 U.S. at 266-67; *see also ARK-MO Farms v. United States*, 530 F.2d 1384, 1386 (Ct. Cl. 1976). Such is certainly not the allegation in the complaint here. *See, e.g.*, Amended Complaint, at ¶ 42 (alleging that 4,600 square miles were flooded, destroying hundreds of millions of dollars of crops, not to mention homes, businesses, and other structures). The court, of course, must presume these facts to be true for purposes of considering defendant's motion. *See Twombly*, 550 U.S. at 555; *see also Kam-Almaz v. United States*, 682 F.3d 1364, 1367-68 (Fed. Cir. 2012) (applying this rule in a takings case). Determining whether these allegations are actually true is a matter preliminarily for discovery and, ultimately, decision later in this case. *See Miller v. United States*, 220 Ct. Cl. 718, 720-22 (1979) (ordering a trial judge to render factual findings regarding application of the *Sponenbarger* doctrine); *Avenal v. United States*, 33 Fed. Cl. 778, 789 (1995), *aff'd*, 100 F.3d 933 (Fed. Cir. 1996) (finding that the application of the doctrine requires "extensive factual determinations"); *see also Hartwig v. United States*, 485 F.2d 615, 622 (Ct. Cl. 1973) (finding that application of the doctrine presented a triable issue of fact that need not be resolved because of other infirmities in the subject complaint). Accordingly, there is no basis for dismissing plaintiffs' complaint now. Indeed, given the factually-intensive nature of the *Sponenbarger* doctrine, it is unsurprising that defendant has failed to cite a single case in which this doctrine has been applied in granting a motion to dismiss under RCFC 12(b)(6).[6]

---

[5] On brief, defendant asserts that, in their amended complaint, plaintiffs acknowledge "that the Mississippi River and Tributaries Project provides their own lands with indispensable protection from flooding." But, a review of the cited paragraph in the amended complaint – indeed, a review of the entire amended complaint – reveals no such statement. Rather, defendant cites a paragraph in the complaint that generically describes the fact that "[t]he Lower Mississippi River Valley is a relatively flat plain of about 35,000 square miles bordering the river, which would be inundated during times of high water if not for man-made protective works." While plaintiffs' property falls within this valley, the court is unwilling to assume – as defendant apparently is – that this means that every parcel at issue has received specific benefits from these flood protections.

[6] *Compare Hendler v. United States*, 175 F.3d 1374, 1382-83 (Fed. Cir. 1999) (reviewing judgment after trial); *Bistline v. United States*, 640 F.2d 1270, 1275 (Ct. Cl. 1981) (reviewing grant of summary judgment); *Bartz v. United States*, 633 F.2d 571, 578 (Ct. Cl. 1980), *cert. denied*, 450 U.S. 967 (1981) (reviewing trial judge's opinion after trial); *Vukovich v. United States*, 229 Ct. Cl. 486, 489-90 & n.3 (1981) (same); *Hartwig*, 485 F.2d at 621 (considering this issue on summary judgment); *Johnson v. United States*, 479 F.2d 1383, 1392 (Ct. Cl. 1973) (applying doctrine after trial); *John B. Hardwicke*, 467 F.2d at 491 (same); *Laughlin*, 22 Cl. Ct. at 111-12 (same).

Defendant's second contention is that a single flooding event may not give rise to a takings.  It notes, in this regard, that the Federal Circuit and this court's predecessor have sometimes stated that "[i]solated invasions, such as one or two floodings . . . , do not make a taking."  *Eyherabide v. United States*, 345 F.2d 565, 569 (Ct. Cl. 1965); *see also Ridge Line*, 346 F.3d at 1357; *Barnes v. United States*, 538 F.2d 865, 870 (Ct. Cl. 1976); *Hartwig*, 485 F.2d at 620; *N. Cntys. Hydro-Electric Co. v. United States*, 151 F. Supp. 322, 323 (Ct. Cl. 1956), *cert. denied*, 355 U.S. 882 (1957).  Defendant views these cases as establishing a black and white rule – one or two floodings is a tort; more than two can be a takings.  But, the decisional law suggests that the inquiry here is more grey.

On closer examination, the flooding cases seem to focus on periodicity only as one indication as to whether defendant has appropriated an interest for itself in the affected property.  While a single flooding may indicate that such an interest has not been taken, that conclusion depends upon whether the flooding was truly an "[i]solated invasion," *Eyherabide*, 345 F.2d at 569, as opposed to an event that characterizes a "permanent liability to intermittent but inevitably recurring overflows."  *Cress*, 243 U.S. at 328; *Cary*, 552 F.3d at 1381.  When the latter has been true, defendant has been found liable in a variety of cases involving permanent flood control facilities.  *See Barnes*, 558 F.2d at 870 (collecting cases).  On the same basis it is conceivable that a takings might lie where defendant, using a permanent structure, purposely floods a property once and expressly reserves the right to do so in the future.  In this instance, it is conceivable that defendant's actions may be viewed not as an "isolated invasion," but rather as reserving a flowage easement over the affected property.  *See Cress*, 243 U.S. at 329; *King v. United States*, 504 F.2d 1138, 1142 (Ct. Cl. 1974); *Richard v. United States*, 282 F.2d 901, 904 (Ct. Cl. 1960), *modified on other grounds*, 285 F.2d 129 (Ct. Cl. 1961); *see also Barnes*, 538 F.2d at 870.[7]  At the least, the cases in this area suggest that "[t]he distinction between tort and takings in the flooding cases is not as easy as saying one flood is a tort and any more than that a taking."  *Arkansas Game & Fish Comm'n v. United States*, 648 F.3d 1377, 1382 (Fed. Cir. 2011) (Moore, J., dissenting); *see also Nat'l By-Prods. v. United States*, 405 F.2d 1256, 1273-74 (Ct. Cl. 1969) ("The distinction between 'permanent liability to intermittent but inevitably recurring overflows,' and occasional floods induced by government projects, which we have held not to be takings, is, of course, not a clear and definite guideline.").[8]

---

[7] In *Portsmouth Harbor Land & Hotel Co. v. United States*, 260 U.S. 327 (1922), defendant erected a fort and installed guns on land adjacent to an ocean-side resort owned by the plaintiff.  The Court held that the number of times the guns was fired did not control the takings analysis, but rather served as one of several barometers of defendant's intent to appropriate the resort.  In this regard, the Court found that "[i]f the United States, with the admitted intent to fire across the claimants' land at will should fire a single shot or put a fire control upon the land, it well might be that the taking of a right would be complete."  *Id.* at 329.

[8] Indeed, in an opinion later reversed by the Supreme Court (on other grounds), the panel majority in *Arkansas Game & Fish Comm'n v. United States*, 637 F.3d 1366, 1377 (Fed. Cir. 2011), *rev'd*, 133 S. Ct. 511 (2012), observed that "permanent structures or improvements, such as dams, canals, or levees . . . often, but not always, yield inevitably recurring flooding." *See also id.* at 1376 ("Most government-induced flooding cases involve overflows caused by

Defendant's counting convention cannot be squared with the modern jurisprudence of temporary takings. Thus, a number of cases hold that conduct that purposely floods property for an extended period of time can give rise to a temporary takings – even if the flooding occurred only one time. *See United States v. Dickinson*, 331 U.S. 745, 746-47 (1947); *Cooper v. United States*, 827 F.2d 762, 762-64 (Fed. Cir. 1987) (finding a takings where flooding was caused by a temporary stream blockage); *Fromme v. United States*, 412 F.2d 1192, 1196 (Ct. Cl. 1969).[9] Indeed, *Eyherabide* itself so held. 345 F.2d at 570 ("The measure of plaintiffs' recovery is for the temporary taking (from 1954 through 1959)."). These cases suggest that, depending upon a variety of other factors, a single flooding event can be evidence of an intent to appropriate an interest in property, that is, a takings. To rule otherwise would be to suggest that a single disastrous flood that lasts a year is not actionable, whereas a dozen floods of the same property for a few hours each might be. *Compare Cooper*, 827 F.2d at 763-64 (flooding occasioned by the construction of a flood control project over a five-year period effectuated a takings even though the flooding was then abated by the Corps). Counting floods is not the controlling consideration. The question, rather, is whether defendant has appropriated an interest for itself in the subject property – and that inquiry requires an examination of multiple factors, certainly beyond whether actual flooding has occurred once, twice, or even a dozen times.

This multi-factored, factually-intensive nature of the takings analysis is well-evidenced in the Supreme Court's recent opinion in *Arkansas Game & Fish*. In that case, the Court reversed a Federal Circuit decision holding that a government-induced flooding, temporary in duration, gains an automatic exemption from Takings Clause inspection. *Ark. Game & Fish*, 133 S. Ct. at 515, 520. The Court rejected this bright-line rule because it viewed the determination of whether a flood results in a takings as a case-specific, factual inquiry, emphasizing that "[f]looding cases, like other takings cases, should be assessed with reference to the 'particular circumstances of each case,' and not by resorting to blanket exclusionary rules." *Id.* at 521 (quoting *United States v. Cent. Eureka Mining Co.*, 357 U.S. 155, 168 (1958)). In its opinion, the Court identified a series of factors that bears on that inquiry, among them: (i) the duration of the flooding; (ii) whether the invasion is intended or is the foreseeable result of authorized government action; (iii) the character of the land at issue and the owner's "reasonable investment-backed expectations" regarding the land's use; and (iv) the severity of the interference. *Ark. Game & Fish*, 133 S. Ct. at 522; *see also Loretto*, 458 U.S. at 436 n.12.[10] A similar approach to the takings analysis is

---

permanent structures or improvements, such as dams, canals, or levees."); *Hartwig*, 485 F.2d at 619 ("The essential inquiry is whether the injury to the claimant's property is in the nature of a tortious invasion of his rights or rises to the magnitude of an appropriation of some interest in his property permanently to the use of the government.").

[9] *See also Tahoe-Sierra Pres. Council*, 535 U.S. at 322 (discussing the temporary takings doctrine); *First Evangelical Lutheran Church*, 482 U.S. at 328 (same).

[10] In *Big Oak Farms, Inc. v. United States*, 105 Fed. Cl. 48 (2012), another judge of this court dismissed a takings complaint under RCFC 12(b)(6), holding that "[w]here, as here,

reflected in flooding cases like *Ridge Line,* 346 F.3d at 1355-56, in which the Federal Circuit employed a two-part test – focusing on causation and appropriation – to distinguish between a takings and a tort.[11] These multifaceted approaches, heavily imbued, as they are, with factual considerations, strongly militate against the adoption of a bright-line rule that would require this court to dismiss plaintiffs' complaint – which avers that the invasion here was intended, the flooding foreseeable, and the damages severe – simply because it cites only a single recent flooding event. In the court's view, plaintiffs should be given the opportunity to develop facts in support of their claims via discovery.[12]

Accordingly, based on the foregoing, the court **DENIES** defendant's motion to dismiss the complaint under RCFC 12(b)(6). On or before September 6, 2013, the parties shall file a preliminary status report which contains the information required by RCFC Appendix A, including a proposed discovery plan for this case. The status report shall also propose a course for dealing with class certification issues under RCFC 23.

**IT IS SO ORDERED**.

s/ Francis M. Allegra
Francis M. Allegra
Judge

---

plaintiff's claim is based upon a single flood that has since receded, plaintiffs have not stated a takings claim." *Id.* at 56. The opinion, however, relied extensively upon the Federal Circuit's decision in *Arkansas Game & Fish*, *see* 105 Fed. Cl. at 55-56, and did not have the guidance provided by the Supreme Court opinion reversing that decision. One must assume that with the latter guidance a different decision would have been reached.

[11] *See also Cary*, 552 F.3d at 1376-77; *Moden v. United States*, 404 F.3d 1335, 1342 (Fed. Cir. 2005); Tyler J. Sniff, "The Waters of Takings Law Should Be Muddy: Why Prospectively Temporary Government-Induced Flooding Could Be a Per Se Taking and the Role for Penn Central Balancing," 23 Fed. Cir. B.J. 53, 63-64 (2011).

[12] Indeed, the Federal Circuit has cautioned that, even in the context of summary judgment, "[t]he fact-intensive nature of just compensation jurisprudence to date . . . argues against precipitous grants of summary judgment." *Yuba Goldfields, Inc. v. United States*, 723 F.2d 884, 887 (Fed. Cir. 1983); *see also Chapman v. United States*, 107 Fed. Cl. 47, 51 (2012).